Raphael Katz
Robert W. Sadowski
SADOWSKI KATZ LLP
830 Third Ave, Fifth Floor
New York, New York 10022
Tel. No.: (646) 503-5341

U.S. DISTRICT COURT - N.D. OF N.Y.
**FILED**
**JAN 1 2 2017**
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Syracuse

*Attorneys for Relator J. Doe*

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA
*ex rel.* J. DOE,

                           Plaintiff/Relator,

          - against -

NORTHLAND ASSOCIATES, INC., THE
DIVERSE CONSTRUCTION GROUP, LLC,
AND JAMES TYLER,

                           Defendants.

**COMPLAINT**

5:17-cv-036 (GTS/TWD)

      Relator J. Doe ("Relator"), by and through his attorneys, Sadowski Katz LLP, alleges for

the complaint as follows:

### PRELIMINARY STATEMENT AND NATURE OF THE ACTION

1.      This is a civil action brought by relator J. Doe on relator's behalf and on behalf of the

United States of America ("United States") against Northland Associates, Inc. ("Northland"),

The Diverse Construction Group, LLC ("Diverse"), and James Tyler, (collectively, the

"Defendants"), under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "False Claims Act"),

to recover damages sustained by, and penalties owed to, the United States. In connection with

construction contracts with the Federal Government, for which only Service-Disabled Veteran-

Owned Small Business Concerns ("SDVOSBC") and Historically Underutilized Business Zone

("HUBZone") firms were eligible to obtain, Defendants knowingly presented, or caused to be

presented, false or fraudulent claims for payment or approval; knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim; and conspired to commit the above acts, all in violation of 31 U.S.C. §§ 3729(a)(l)(A), (B), & (C).

2.      Defendants engaged in a scheme whereby they created a sham company, Diverse, to bid for and fraudulently obtain over fifty million dollars of contracts from the United States for various construction projects.

3.      To induce the Government and to obtain such contracts, Defendants fraudulently certified that Diverse was a self-certified SDVOSBC and a certified HUBZone firm, even though it was not.

4.      Rather, Defendant Northland, its owner Defendant James Tyler, conspired to set up Diverse with a service-disabled veteran, Hunter Grimes.  Under the scheme, Grimes would act as the majority owner, while in reality Northland and Tyler retained true ownership and control of Diverse at all times.

5.      Once Northland secured the contracts under the name of Diverse, Northland employees performed the work under the contract as well as obtained millions of dollars of valuable subcontractor work.  In order to maintain the scheme, Defendants made additional false statements to the Government in response to a size determination, and maintained a phony office for Diverse while the work was actually performed out of Northland's offices.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a) (False Claims Act), 28 U.S.C. §1331 (Federal Question), 28 U.S.C § 1345 (United States as plaintiff), and supplemental jurisdiction over the remaining claims

7.      Venue lies in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(l) and (2) because at least one of the Defendants resides or transacts business in the Northern

District of New York and all Defendants reside in New York, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

8.      This action is not jurisdictionally precluded by the public disclosure bar of the False Claims Act, 31 U.S.C. § 3730(e)(4). Upon information and belief, there has been no "public disclosure" of the matters alleged herein, and this action is not "based upon" any such disclosure. Through his interactions with various employees of the Defendants and other persons, Relater has "direct and independent knowledge" of the instant allegations. In addition, Relater has "voluntarily provided" and offered to provide this information to the Government before the filing of this complaint. Therefore, to the extent any of these allegations is deemed to have been based upon a public disclosure, Relater is an "original source" of this information within the meaning of the False Claims Act and is expressly excepted from the public disclosure bar.

## THE PARTIES

9.      Plaintiff is the United States of America on behalf of its agencies, the United States Department of Veteran Affairs ("VA") and the Small Business Administration ("SBA").

10.     Relator J. Doe is a former employee of Northland.

11.     Defendant Northland is a New York Corporation located in Liverpool, New York. It is a general contractor and construction management firm, which, at all times pertinent to this action, was controlled by Defendant James Tyler.

12.     Defendant Diverse is a New York Limited Liability Company located in Plessis, New York.

## THE LAW
### The SDVOSBC Program

13.    The purpose of the SDVOSBC program is to provide procuring Government agencies with the authority to set acquisitions aside for exclusive competition among SDVOSBCs.  In essence, it allows businesses with SDVOSBC status to obtain lucrative contracts with the Government that they would otherwise be unable to obtain.

14.    A "service-disabled veteran business" is a small business concern owned and controlled by service-disabled veterans, as defined in section 3(q) of the Small Business Act.  15 U.S.C. § 632(q).

15.    The term "service-disabled veteran" means a veteran, as defined in 38 U.S.C. § 101(2), with a disability that is service-connected.  "Service-connected" means, "with respect to disability . . . that such disability was incurred or aggravated . . . in line of duty in the active military, naval, or air service."  38 U.S.C. § 101(16).

16.    A federal contracting officer may award a sole source contract to any small business concern owned and controlled by service-disabled veterans.  The concern must be a responsible contractor with respect to performance of such contract opportunity and the contracting officer does not have a reasonable expectation that two or more small business concerns owned and controlled by service-disabled veterans will submit offers for the contracting opportunity; and the anticipated award price of the contract (including options) will not exceed $5,000,000, in the case of a contract opportunity assigned a standard industrial classification code for manufacturing, or $3,000,000 in the case of any other contract opportunity; and in the estimation of the contracting officer, the contract award can be made at a fair and reasonable price.  15 U.S.C. § 657(f).

17.     Contractors seeking to secure these selective bids and contracts with the VA or other government agencies must register electronically and certify that they qualify as an SDVOSBC. A business concern must be at least 51% unconditionally and directly owned by one or more service-disabled veterans to qualify as a SDVOSBC. 15 U.S.C. § 632(q)(2); 13 C.F.R. § 125.10; 38 C.F.R. § 74.4. Moreover, to be an eligible SDVOSBC, the management and daily business operations of the concern must be controlled by one or more service-disabled veterans. *Id.* Control by one or more service-disabled veterans means that both the long-term decision making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans. *Id.*

18.     Prior to February 8, 2010, a service-disabled veteran was not deemed to control the SDVOSBC if he or she did not show sustained and significant time invested in the business. As of February 8, 2010, the service-disabled veteran is also required to devote full-time to the business during normal working hours in order to control the SDVOSBC. 38 C.F.R. § 74.4(c).

19.     A non-veteran or entity may be considered to control an SDVOSBC in numerous situations including the following: where it has equity interest in or provides critical financial support to the SDVOSBC, allowing it to influence business decisions of the SDVOSBC; where it has a business relationship with the SDVOSBC which causes such dependence that the SDVOSBC cannot exercise independent business judgment without great economic risk. 38 C.F.R. § 74.4(i).

20.     A non-veteran may also be deemed to control an SDVOSBC where it participates in its management and/or has the power to control the SDVOSBC; is a former employer or a principal of a former employer of any affiliated business of the SDVOSBC, unless there has been a specific determination that the non-veteran does not have the power to control the SDVOSBC; or

receives compensation that exceeds the compensation of the highest ranking officer of the SDVOSBC. 38 C.F.R. § 74.4(g).

21.     An SDVOSBC will be deemed improperly affiliated with a non-SDVOSBC and therefore not qualify as an SDVBOC, where the non-SDVOSBC has the power to control the SDVOSBC; exercises control indirectly; the two entities have an identity of interest with the SDVOSBC due to shared equipment, employees, location, shared contractual relationships, or economic dependence; the two companies have shared management; or one company's management or key employees founded the new company.  Affiliation is determined by looking at the totality of the circumstances.  13 C.F.R. §121.103(a), (d), (e), (f), and (g).

### The HUBZone Program

22.     The purpose of the HUBZone program is to provide federal contracting assistance for qualified small business concerns located in underutilized business zones, in an effort to increase employment opportunities, investment, and economic development in such areas.

23.     To qualify as a HUBZone for set-aside Government contracts, a firm would have to be located in an underutilized business zone in additional to being a small business concern.

24.     Like the SDVOSBC rules, a firm would be disqualified from receiving a set-aside contract if it were affiliated with or controlled by a non-HUBZone firm.

### The Federal False Claims Act

25.     The False Claims Act, as amended, provides, in pertinent part, that:

> any person who (A) knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; (C) conspires to commit a violation of subparagraph (A), (B) . . .

> is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000]... plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

## THE FACTS

### Overview of the False and Fraudulent Schemes

#### *Northland and Jim Tyler Set up the Sham SDVBOC Diverse*

26.     Starting in 2007, Defendants Northland and Jim Tyler conspired with Hunter Grimes to obtain lucrative SDVOSBC and HUBZone contracts with the VA. Tyler convinced Grimes to lend his name to a sham SDVOSBC, which he agreed to do.

27.     In 2005, Tyler promoted seven of his Northland employees to be a newly formed "Executive Committee," promising them profit-sharing and an increased bonus. The seven employees were Richard Capirci, Timothy Tyler, (Jim Tyler's cousin), Raymond Swierk, James Hagan, Dennis Baron, Larry LaComb, And Michael McKenna.

28.     In 2006, Tyler then pressured his Executive Committee to become minority owners of Diverse, telling them it was a great opportunity and that they could use their bonuses to buy in to the company, which he caused to be formed in November 2007, and caused the Operating Agreement to be executed in April 2008.

29.     The Executive Committee, when approached by Tyler, asked him where they would acquire bonding. Tyler responded, "let me worry about that," and then proceeded to secure initial bonding from Diverse using Northland's bonding company, Rose & Kiernan, Inc., out of its Rochester, New York office.

30.     Diverse was created solely to enable Northland and Diverse to unlawfully obtain lucrative contracts with the Government under the guise that Diverse was a small business owned and controlled by Grimes, a service-disabled veteran.

**Tyler and Northland Controlled Diverse.**

31.     Grimes, at all times pertinent to this action, was the figurehead, only, of Diverse, without the experience or capabilities to run such a venture. Grimes did not control Diverse or take part in any of its management or decision-making. His ownership and control of Diverse was in name only.   Indeed, he was often not present at Diverse meetings and was almost never present at meetings to determine which projects to bid on. In fact, Tyler would often tell his Northland employees that Grimes was just a "qualifier" and that "when we need him, we take him out of the closet, and when we are done with him, we put him back in."

32.     Tyler operated Diverse out of Northland's offices in Liverpool, New York. Tyler made all important financial and staffing decisions for Diverse just as he did for Northland. Tyler met weekly with his Executive Committee concerning Northland and Diverse business. Initially, Diverse's "office" was at Tyler's residence. In April 2010, Tyler, conspired with Grimes to set up official offices in Plessis, New York, near where Grimes resided to give the appearance that Diverse was a separate business. However, almost no work was done there. In fact, the double-wide trailer that comprised the so-called office was Northland property. Instead, the Executive Committee along with other Northland employees performed the bulk of the work from the Northland offices. At the Executive Committee meetings for Northland, Tyler discussed and made ultimate decisions for all Diverse business. Grimes did not attend these meetings, let alone direct them. Indeed, Grimes was rarely there for the meetings when it was decided which projects to bid upon. Tyler was there and made the ultimate decision on bids. There were no separate Diverse meetings. Tyler discussed and made the financial and staffing decisions for Diverse. All decisions relating to Diverse required Tyler's approval. Grimes made none of the decisions.

33.     At Tyler's direction, his Executive Committee and part-owners of Diverse, worked on Diverse matters from the Northland location, while continuing to be employed and paid by Northland. For example, Ray Swierk oversaw Diverse accounting, Richard Capirci oversaw the bidding and construction management, as well as worked as an estimator and purchaser, and Ronald Burlin, (who became a member of the Executive Committee of Northland and minority owner of Diverse in December 30, 2011), handled bidding and purchasing for Diverse long before he became a part-owner. The Executive Committee did all this work for Diverse during business hours for Northland, while they were in Northland's offices and employed and paid to work on Northland matters. When an Executive Committee employee left or was terminated by Northland, Tyler forced that individual to forfeit their Diverse "ownership."

34.     Tyler also directed other Northland employees to perform Diverse work. For example, Kathy Champlin was employed by Tyler to run payroll at Northland and also handled Diverse's payroll from Northland's offices. Gale Dolan, who was employed by Tyler to handle Accounts Payable and Receivable for Northland, was also directed by him to assist with Diverse's accounting, which was all performed from Northland's offices and while on Northland payroll.

35.     Mike McClimmands, an estimator on Northland payroll, purchased, wrote contracts, and handled shop drawings for Diverse, all from Northland's offices. Brian Carvalho, was an estimator on Northland payroll who did bidding work for Diverse. Josh Parsons, was a Northland employee who did information technology and estimation work for both Northland and Diverse. The Northland estimators were given separate cell phones to use for Diverse work and maintained Diverse email addresses.

36.     Maria Shockney, Northland's receptionist and Diane Smith, who were on subcontractor insurance, were Northland employees that Tyler tasked with preparing technical proposals for Diverse.

37.     Other Northland employees, such as superintendents, initially performed work for Diverse while still employed for Northland. Tyler directed that, for appearances, they be transferred to Diverse Payroll. Most continued to work from Northland's offices and drove Northland trucks for extended periods of time. If a particular project was completed, the employees were then transferred back to Northland payroll.

38.     Diverse bidding was handled by Northland and out of Northland's offices. Therefore, solicitations were actually physically sent out from Northland on Diverse's behalf. Josh Parsons sent out the solicitations via blind facsimiles and blind emails.

39.     Diverse estimation was also done form Northland's offices, and all faxes relating to estimation that Diverse received were automatically forwarded to Northland. This was also handled by Josh Parsons.

40.     Jason Franklin, was on Northland payroll for years, assisting Ray Swierk with Northland and Diverse accounting. Northland's outside accountants, Firley, Moran, & Essa, also handled Diverse's accounting. Tyler met annually with them to discuss the accounting for both Northland & Diverse.

***Defendants fraudulently obtain lucrative government contracts, falsely represent Diverse as a SDVOSBC, and attempt a cover-up.***

41.     Starting in 2008 through 2016, Defendants fraudulently obtained numerous contracts with United States agencies, including the VA—worth over 56 million dollars—by falsely certifying that Diverse was a SDVOSBC and a HUBZone. In reality, it was merely an extension of Northland and wholly controlled by Tyler and his Executive Committee.

42.     Defendants' false certifications fraudulently induced the Government to award the tens of millions of dollars of contracts to Diverse.

43.     Once Tyler secured the lucrative VA contracts through Diverse, his sham SDVOSBC, he treated the contracts and resulting revenue as his own, including staffing Diverse's work on the contracts with Northland employees.

44.     Tyler and Northland also made all financial decisions concerning the work on the contracts awarded to Diverse, including causing Diverse to subcontract millions of dollars of the work to Northland or companies owned by Northland, thereby fraudulently funneling money to Northland.

45.     Tyler covered up this scheme by directing his Executive Committee to be direct owners, yet ensured that Diverse' Operating Agreement falsely stated that Grimes would have sole management authority. In reality, the Executive Committee managed all Diverse work, answering only to Tyler, and using other Northland employees to do the work. Grimes had no management role. Ray Swierk, in particular worked closely with Tyler to ensure Diverse operated the way Tyler wanted.

*Defendants fraudulently oppose a bid protest and continue their cover-up.*

46.     In September 2009, Tyler and Northland caused Diverse to make a bid for a solicitation issued in August 2009 by the Departments of the Navy and Air Force, National Guard Bureau for construction projects in Fort Drum, New York, which were set aside for HUBZone firms.

47.     After Diverse won the solicitation with the low bid, an unsuccessful offeror contested the bid, which led to a size determination. The Area Office determined that Diverse was other than small because of its affiliation with Northland. It determined that Diverse and Northland were

11

affiliated solely because of their contractor/subcontractor relationship and because seven
Northland employees were minority owners of Diverse.

48.     Diverse appealed the determination and through fraudulent statements was successful on
appeal.  Tyler conspired with Grimes to submit false statements on appeal. These included a
declaration from Mr. Grimes and certifications from Grimes and Tyler, all dated October 26,
2009.

49.     Defendants made or caused to be made the following key false statements and/or
misleading statements and omissions in those documents:

* the false statement that Northland did not control Diverse;

* the false statement that Northland shared no employees, facilities, office space, or
  equipment with Diverse;

* the false statement that Northland did not financially assist Diverse or assist Diverse in
  obtaining bonding;

* the false statement that seven minority owners of Diverse, did not have significant
  influence over and were not key employees of Northland;

* the false statement that Northland provided no assistance to Northland in the bid
  application process; and

* the misleading statement that the Operating Agreement gave Grimes complete control
  giving him the sole and exclusive right to manage the company, without disclosing that
  Grimes did not in fact manage Diverse, but management was done by the seven
  Northland employees, with Tyler signing off on all ultimate decisions; and

- the false statement that only financial obligations between Diverse and Northland were the contractor/subcontractor relationship and business done between the two entities were arms-length transactions.

50.    Based on these materially false statements and omissions, Diverse's appeal was successful, allowing Defendants to continue to fraudulently bid upon and perform tens of millions of dollars of federal contracts.

51.    To better hide its tracks and cover up Defendants' fraud, after the designation and appeal, Diverse switched its bonding agent from the one it previously shared with Northland. Additionally, it was only after the protest that Tyler caused Diverse to open its own physical office in Plessis, NY, even though the work for Diverse continued to be done from Northland's offices.   In the event that the federal representative on the government contract was visiting, Tyler directed that staff, equipment and files be temporarily transferred for the day to the Plessis, NY office.

## FIRST CLAIM
### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1)(A))
### Presenting False Claims for Payment

52.    The United States and Relator incorporate by reference the above paragraphs as if fully set forth herein.

53.    The United States seeks relief against Defendants under Section § 3729(a)(l)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(l)(A).

54.    As set forth above, Defendants knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval in connection with the submission of claims for payment for contractual services, which contracts were fraudulently obtained.

55.    The Government paid out federal funds because of Defendants' fraudulent conduct.

13

56.     By reason of Defendants' false claims, the United States has been damaged in a
substantial amount to be determined at trial.

## SECOND CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1)(B))
### Use of False Statements

57.     The United States and Relator incorporate by reference the above paragraphs above as if
fully set forth herein.

58.     The United States seeks relief against Defendants under Section § 3729(a)(1)(B) of the
False Claims Act, 31 U.S.C. 3729(a)(1)(B).  Defendants, knowingly made, used, or caused to be
made and used, false records and statements material to false or fraudulent claims paid or
approved in connection with the submission of contract bids and claims for payment for
government contracts fraudulently obtained.

59.     The SDVOSBC and HUBZone programs paid such false or fraudulent claims because of
Defendants' acts and conduct.

60.     By reason of Defendants' causation to make or use false claims, the United States has
been damaged in a substantial amount to be determined at trial.

## THIRD CLAIM

### Violations of the False Claims Act
### (31 U.S.C. § 3729 (a)(1)(C))
### Conspiracy to Commit a Violation of the False Claims Act

61.     The United States and Relators incorporate by reference the paragraphs above as if fully
set forth herein.

62.     The United States seeks relief against Defendants under Section § 3729(a)(1)(C) of the
False Claims Act, 31 U.S.C. § 3729(a)(1)(C).

63.    As set forth above, Defendants conspired to commit a violation of subparagraph (A) and (B) of the False Claims Act.

64.    Defendants have committed at least one overt act in furtherance of their conspiracy.

65.    By reason of the Defendants' conspiracy, the United States has been damaged in a substantial amount to be determined at trial.

WHEREFORE, Relator J. Doe requests that judgment be entered in his

favor and against Defendants as follows:

        (a)    On the First, Second, and Third Claims for Relief (violations of the False Claims Act, 31 U.S.C. § 3729(a)(l)(A), (B), and (C)), for treble the United States' damages, in an amount to be determined at trial, and an $11,000 penalty for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants; and

        (b)    Awarding Relator his relator's share pursuant to 31 U.S.C. § 3730(d)(l) or (2); and

        (c)    On the First, Second, and Third Claims for Relief, an award of costs and attorney's fees pursuant to 31 U.S.C. § 3730(d); and

        (d)    Awarding such further relief as is proper.

**JURY TRIAL IS DEMANDED**

Dated: New York, New York
      January 5, 2017

                               SADOWSKI KATZ LLP

By:

                               Raphael Katz
                               Robert W. Sadowski
                               830 Third Avenue, Fifth Floor
                               New York, New York 10022
                               Telephone: (646) 503-5341
                               rkatz@sadowskikatz.com
                               rsadowski@sadowskikatz.com