# SETTLEMENT AGREEMENT

This Settlement Agreement (Agreement) is entered into by and among the United States of America, acting through the United States Attorney's Office for the Northern District of New York and on behalf of the United States Small Business Administration (SBA), the United States Department of Veterans Affairs (VA), the United States Department of the Army (Army), and the United States Department of Transportation (DOT) (collectively, the "United States"), Northland Associates, Inc. (Northland or NAI), JDS Construction (JDS), James Tyler (NAI's President), and The Diverse Construction Group, LLC (Diverse or DCG) (collectively, the "Defendants"), and Relators James Hagan and James Hohm (Relators), through their authorized representatives. Collectively, all of the above will be referred to as "the Parties."

## RECITALS

A.      NAI is a general contractor and construction management firm located in Liverpool, New York. JDS is an unincorporated division of NAI. James Tyler is the majority shareholder and President of NAI/JDS.

B.      DCG is a general contractor with an office in Plessis, New York.

C.      In 2005, NAI's President appointed several NAI employees, who he later described in layman's terms as his "key employees," to NAI's newly formed Executive Committee. The purpose of the Executive Committee was to help NAI's President run NAI's day-to-day operations and discuss business strategy.

D.      In May 2006, NAI's President and certain NAI personnel met with NAI's then-surety broker and NAI's then-surety. The surety's internal memorandum concerning the meeting describes numerous items that were discussed related to NAI's

1

business.  Under "Future Jobs," the notes include a section entitled "HUBZONE OPPORTUNITIES," which states as follows: "For jobs under $10MM, they [NAI] wish to bid through/behind a small company in Watertown that has a friendship and sub contractor relationship with [NAI's President] that goes back 20 years."  The surety's subsequent internal notes indicate that NAI was "looking to form a Disabled Vet company through Hunter Grimes.  We discussed the need for adequate net worth thresholds made up of a combination of capital and subordinated funds."  The company referenced in the preceding sentence became DCG, which was formed in November 2007 as a service-disabled veteran-owned small business.

E.      The late Hunter Grimes III, who was a service-disabled veteran, became the majority shareholder and managing member of DCG, with an initial 51% ownership interest.  The remaining 49% ownership interest was divided among seven initial investors, all of whom were NAI employees who served on NAI's Executive Committee. Although the DCG minority owners changed over time, each was a NAI employee and member of its Executive Committee.

F.      At all times relevant to this Agreement, a significant amount of DCG's administrative functions were performed from NAI's office.

G.      DCG business was sometimes discussed at NAI Executive Committee meetings.  NAI's President was present at those meetings; the DCG Managing Member was not.

H.      There were also DCG meetings that the DCG Managing Member attended.  NAI's President sometimes attended those meetings or received minutes from the meetings.

2

I.      In addition to NAI's role as a subcontractor to DCG, NAI employees performed work for DCG. For example, NAI employees sent out bid solicitations for DCG from a fax machine set up at NAI to send and receive DCG faxes. DCG also stored business records on NAI's computers and in NAI's office. NAI employees also handled DCG administrative functions, such as accounting, expediting, estimating, purchasing, contracting, and certain clerical work.

J.      In 2009, a NAI employee created, updated, and circulated to NAI employees (including its President and the DCG minority members) a "bid calendar" containing the deadlines for upcoming bids that NAI and DCG could bid on.

K.      Certain DCG employees received life insurance, health insurance, and other fringe benefits through NAI. Defendants represent that DCG always reimbursed NAI for the full value of these benefits.

L.      When two members of NAI's Executive Committee were terminated from or asked to leave NAI, they were also asked by the other DCG members to divest their interests in DCG.

M.      In September 2009, a company submitted a size protest to the SBA in connection with a HUBZone set-aside contract that the Army had awarded to DCG. The company alleged that DCG was not qualified to bid on the contract because DCG was not a small business by virtue of its affiliation with NAI. The protest was dismissed but, shortly thereafter, the contracting officer requested a formal size determination for DCG.

N.      In connection with the size determination, NAI's President and the DCG Managing Member each submitted SBA's Form 355 to the SBA area office, in which each certified that: (a) "The only services provided between Northland and DCG have

been as part of a prime contractor-subcontractor relationship . . . [which] have been memorialized through subcontracts that were negotiated at arms length"; (b) "The only financial obligations between Northland and DCG have been a result of their prime contractor-subcontractor relationships"; and (c) and NAI and DCG shared no "facilities, equipment, or personnel."

O.  Relying in part on these representations, an SBA administrative law judge held that DCG was a "small" business not affiliated with NAI. Subsequently, DCG was awarded the protested contract.

P.  As reflected above, prior to the protest, NAI provided accounting, expediting, estimating, purchasing, contracting, clerical work, and other services to DCG. Those services were not part of the "prime contractor-subcontractor relationship" and they were not "memorialized through subcontracts that were negotiated at arms length," as represented in the Forms 355. Following the protest, NAI continued to provide these services to DCG, outside of the prime contractor-subcontractor relationship, and without memorializing the arrangement.

Q.  Prior to and following the protest, DCG work was performed at NAI's office, using NAI office equipment (including computers), and DCG stored paper records at NAI's office. Some NAI employees also performed work on DCG jobs.

R.  Following the protest, DCG transferred approximately $2 million to NAI, mostly through a NAI subsidiary, Maple Ridge Plateau, Inc. (Maple Ridge). Maple Ridge never performed work for DCG. Defendants represent that, at the time of the transfers, NAI and DCG intended these transfers to serve as reimbursement for administrative services that NAI had previously provided to DCG.

4

S.      Following the protest, DCG made several short-term interest-free loans to NAI, which were not memorialized, totaling approximately $1.5 million.

T.      The DCG Managing Member passed away in September 2015. Earlier that year, he reached out to DCG's surety broker, and expressed his interest in selling his shares in DCG to the other owners and inquired about how much money he could make without affecting DCG's ability to obtain bonding. The email stated, among other things: (a) "I want to extricate myself from the tangled web known as Diverse"; (b) "I have long had concerns about the consequences of this shadow business imploding"; (c) in 2007, "I did adequate research to know well what was required to satisfy sba rules and regulations" and had "a clear understanding of the ugly consequences of getting caught"; and (d) "In the past year [*i.e.*, 2014-2015] we have had two unannounced office visits and both times I was able to bullshit my way through them …. The noose has tightened such that all concerned need to understand that getting caught is inevitable."

U.      The "unannounced visits" to which the DCG Managing Member was referring in Paragraph T were site visits by the VA's Center for Verification and Evaluation designed to confirm that DCG had an operational office in Plessis. A DCG minority member (who was employed by NAI) and an individual who had worked for both companies asserted that, in anticipation of these visits, they moved files from NAI's office to DCG's Plessis office to make it look like DCG had a fully-functioning office in Plessis. They further asserted that, after the inspectors left, they returned the DCG files to NAI's office. A DCG employee who worked in the Plessis office asserted that these two individuals "brought their [DCG] files" from NAI's office to DCG's office, and then brought the files back to NAI following the inspection.

V.     In April 2015, five months prior to his death, the DCG Managing Member sold his interest in DCG. DCG's net worth at the time was valued at approximately $1.2 million. DCG wrote the DCG Managing Member a $757,653.42 check, which reflected his then 67% ownership interest in the company. That same day, the DCG Managing Member wrote personal checks for $146,616.04 to DCG's four remaining minority owners. Those individuals, in turn, each wrote a personal check for the same amount to DCG. As a result, the DCG Managing Member sold his interest for 15% of DCG's net worth.

W.     Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3730(b), Relator Hagan filed *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) on January 12, 2017 and Relator James Hohm filed *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 on April 30, 2018 (collectively, the "Civil Actions"). Relators allege, among other things, that NAI, DCG, and NAI's President presented, caused to be presented, and conspired to present, false claims and statements to the United States in connection with contracts that were set aside for performance by service-disabled veteran-owned small businesses and small business operating in historically underutilized business zones.

X.     The United States contends that it has certain civil claims against Defendants under the False Claims Act, codified at 31 U.S.C. §§ 3729-3733, and the common law, as specified below, for allegedly engaging in the conduct set forth in this Paragraph in connection with the federal contracts awarded to DCG, and any

6

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

subcontracts awarded by DCG under the federal contracts, from 2005 through the

Effective Date of this Agreement (collectively the "Covered Conduct"):

> The United States alleges that the conduct set forth in Paragraphs A-V above was part of a scheme devised and engaged in by NAI, DCG, and NAI's President to circumvent service-disabled veteran-owned small business and HUBZone contracting requirements in order to secure contracts for DCG, and subcontracts for NAI/JDS on federally funded projects.

> The United States alleges that NAI exerted significant influence over DCG's decision-making process during the bid, award, and performance of these contracts. The United States contends that NAI exercised influence over DCG in various ways, including by staffing DCG primarily with former NAI employees and funneling contracts to NAI and JDS for fulfilment. The United States contends that NAI also provided DCG with considerable resources, which provided the latter company a competitive advantage over legitimate service-disabled veteran-owned small businesses and HUBZone businesses that were not affiliated with a larger company. In connection with the award of contracts to DCG, the United States alleges that Defendants submitted or caused to be submitted false certifications and statements to the United States representing that DCG met all requirements to be a service-disabled veteran-owned small business and a HUBZone business when they knew, or should have known, that DCG did not meet such requirements because DCG was, at all times, affiliated with NAI.

> The United States alleges that NAI's President and the DCG Managing Member knowingly made material misrepresentations in their sworn statements to the SBA in connection with the 2009 size determination. The United States contends that, after the size protest and size determination, NAI caused DCG to funnel more than $1 million through an NAI subsidiary, Maple Ridge, to hide NAI's financial affiliation with DCG. The United States further contends that, after the bid protest and size determination, when DCG and NAI received notice of planned government inspections of DCG's office in Plessis, NAI staff temporarily relocated DCG's files from NAI's Liverpool office to DCG's Plessis office for two or three days to give government inspectors the false impression that Plessis was a "functioning office."

> The United States alleges that, by diverting contracts and benefits therefrom intended for service-disabled veterans and HUBZone entities towards an ineligible company, Defendants undercut the purpose of statutorily created programs designed to encourage contract awards to legitimate small businesses. The United States alleges that it did not receive the intended

benefits of service-disabled veteran-owned small businesses and small HUBZone businesses receiving and performing federal contracts. The United States contends that the alleged scheme resulted in the government's inappropriate award of approximately $57 million in federal contracts to DCG.

Y.      Relators claim entitlement under 31 U.S.C. § 3730(d) to a share of the proceeds of this Settlement Agreement and to Relators' reasonable expenses, attorneys' fees and costs. Relators represent that they have reached a separate agreement, without involvement of the United States or the Defendants, to allocate as they deem appropriate funds the United States will pay to Relator Hagan. Defendants do not agree that Relator Hohm is entitled to a share of the proceeds of this Settlement Agreement because his action is precluded by the "first-to-file bar," 31 U.S.C. § 3730(b)(5). Subject to Paragraph 3 below, Defendants expressly reserve the right to object to and challenge on any grounds attorneys' fees, expenses, and costs sought by either Relator or their counsel.

Z.      Defendants admit, acknowledge, and accept responsibility (with regard to their respective conduct only) for that which is set forth in Paragraphs A-V above, as well as the following allegations: (1) each Defendant's conduct in connection with the federal contracts awarded to DCG violated SBA and VA regulations designed to encourage contract awards to legitimate service-disabled veteran-owned small businesses and small businesses operating in historically underutilized business zones unaffiliated with a larger entity; (2) in 2009, NAI and DCG, through their respective majority owners, made false representations regarding their affiliation with one another to the SBA in connection with the protest of a contract awarded to DCG in 2009; (3) NAI's affiliation with DCG contributed to DCG's ability to compete for and perform small business contracts for which the latter company was ineligible; and (4) DCG provided NAI/JDS with $8.3

8

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

million in subcontracts under service-disabled veteran-owned small business and HUBZone prime contracts, to which DCG was not entitled for the reasons acknowledged in this Paragraph, and NAI generated approximately $1.44 million in gross profits and $560,000 in net profits as a result.

AA.     This Settlement Agreement is neither an admission of liability by Defendants nor a concession by the United States that its claims are not well founded.

To avoid the delay, uncertainty, inconvenience, and expense of protracted litigation of the above claims, and in consideration of the mutual promises and obligations of this Settlement Agreement, the Parties agree and covenant as follows:

<u>TERMS AND CONDITIONS</u>

1.     Defendants agree to pay the United States $4,350,000, of which $2,175,000 is restitution, plus simple interest at a rate of 2.125% per annum from April 24, 2020 until and including the day that final payment is made under this Agreement (Settlement Amount), per the terms set forth in Paragraphs 1(a)-(d). Payment to the United States of the Settlement Amount shall be made by electronic funds transfer pursuant to written instructions to be provided by the United States no later than 10 days after the Effective Date of this Agreement.  On the Effective Date of this Agreement, this sum shall constitute a debt due and immediately owing to the United States. The entire balance of the Settlement Amount, or any portion thereof, plus any interest, as defined above, accrued on the principal as of the date of any prepayment, may be prepaid without penalty.

a.     By December 20, 2020, James Tyler or NAI shall make payment to the United States of at least $2,125,000, plus simple interest at the rate identified in

Paragraph 1, with at least $100,000 of that amount being paid directly to the Government by James Tyler. James Tyler and NAI are jointly and severally liable for this payment (*i.e.*, $2,125,000).

   b. By December 20, 2020, DCG shall make payment to the United States of $100,000, plus simple interest at the rate identified in Paragraph 1.

   c. NAI shall pay the United States the remaining principal of the Settlement Amount due following the December 20, 2020 payments, plus simple interest at the rate identified in Paragraph 1, in five equal installments, on the following dates: (i) October 20, 2021; (ii) October 20, 2022; (iii) October 20, 2023; (iv) October 20, 2024; and (v) April 30, 2025; provided, that NAI shall not be responsible for the payment due from DCG pursuant to Paragraph 1.b. If any of these dates falls on a non-business day, payment shall be due on the first business day thereafter.

   d. NAI's payment obligations pursuant to Paragraph 1.c shall be secured by a Letter of Credit in a commercially reasonable form (substantially similar to the form attached as Exhibit A, as modified to reflect the payment terms set forth in Paragraph 1.c) that NAI agrees to cause to be issued within 15 business days of the Effective Date of this Agreement. If NAI is unable to obtain a Letter of Credit, James Tyler and NAI shall be jointly and severally liable for NAI's payment obligations pursuant to Paragraph 1.c; provided, that if the Letter of Credit is obtained, James Tyler shall not be jointly and severally liable for NAI's payment obligations pursuant to Paragraph 1.c. Following issuance of the Letter of Credit, NAI may, with the prior written approval of the United States, which shall not be unreasonably withheld, cause to be issued a substitute Letter of Credit of like terms and conditions, which shall be

reduced based on amounts paid to the United States. If the Letter of Credit expires before the entire outstanding balance due under it is paid, NAI shall cause to be issued a substitute Letter of Credit of like terms and conditions, which shall take into account the amount paid to the United States.

2.      Conditioned upon the United States receiving the Settlement Amount payments from Defendants, the United States agrees that it shall pay to Relator Hagan by electronic funds transfer 22.98 percent of each such payment received under the Settlement Agreement as soon as feasible after receipt of the payment.

3.      Notwithstanding any objections in this Agreement, including, but not limited to, those set forth in Paragraph Y, NAI and Relators have agreed to settle Relators' claims for reasonable attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d), in accordance with the following:

a.      Relator Hagan shall receive $145,000 from NAI in full satisfaction of Relator Hagan's claims for attorneys' fees, expenses, and costs against any and all Defendants related to the Civil Actions. Half of this amount shall be paid on October 15, 2020, and the remaining half shall be paid on December 20, 2020. Both payments shall be made by check in accordance with written instructions (specifying the payee and payment address) provided by Relator Hagan's counsel to NAI's counsel. Such instructions shall be provided no later than four weeks in advance of the payment due date. If the payment instructions are provided less than four weeks in advance of the payment due date, the payment shall be due no sooner than four weeks from the date of receipt of the payment instructions.

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

b. Relator Hohm shall receive $75,000 from NAI in full satisfaction of Relator Hohm's claims for attorneys' fees, expenses, and costs against any and all Defendants related to the Civil Actions. Half of this amount shall be paid on October 15, 2020, and the remaining half shall be paid on December 20, 2020. Both payments shall be made by check in accordance with written instructions (specifying the payee and payment address) provided by Relator Hohm's counsel to NAI's counsel. Such instructions shall be provided no later than four weeks in advance of the payment due date. If the payment instructions are provided less than four weeks in advance of the payment due date, the payment shall be due no sooner than four weeks from the date of receipt of the payment instructions.

4. Subject to the exceptions in Paragraph 6 (concerning excluded claims) below, and subject to Paragraph 8 (concerning disclosure of assets), Paragraph 13 (concerning default) and Paragraph 15 (concerning bankruptcy), and upon the United States' receipt of the Settlement Amount, the United States releases each Defendant, together with their current and former parent corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; affiliates; current or former entity owners; and the corporate successors and assigns of any of them, from any civil or administrative monetary claim the United States has for the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; or the common law theories of breach of contract, payment by mistake, unjust enrichment, and fraud.

5. Relators, for themselves and for their heirs, successors, attorneys, agents, and assigns, release Defendants together with their current and former parent

corporations; direct and indirect subsidiaries; brother or sister corporations; divisions; affiliates; current or former owners, officers, directors, employees, servants and agents of any of the foregoing; and the successors and assigns of any and all of them from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Relators have asserted, could have asserted, or may assert in the future against Defendants related to the Covered Conduct under the False Claims Act, 31 U.S.C. §§ 3729-3733 or otherwise.

6.     Notwithstanding the releases given in Paragraphs 4 and 5 of this Agreement, or any other term of this Agreement, the following claims of the United States are specifically reserved and are not released:

a.  Any liability arising under Title 26, U.S. Code (Internal Revenue Code);

b.  Any criminal liability;

c.  Except as explicitly stated in this Agreement, any administrative liability, including the suspension and debarment rights of any federal agency;

d.  Any liability to the United States (or its agencies) for any conduct other than the Covered Conduct;

e.  Any liability based upon obligations created by this Agreement;

f.  Except as explicitly stated in this Agreement, any liability of individuals;

g.  Any liability for express or implied warranty claims or other claims for defective or deficient products or services, including quality of goods and services;

h.  Any liability for failure to deliver goods or services due; and

i.  Any liability for personal injury or property damage or for other consequential damages arising from the Covered Conduct.

7.  Relators and their heirs, successors, attorneys, agents, and assigns shall not object to this Agreement but agree and confirm that this Agreement is fair, adequate, and reasonable under all the circumstances, pursuant to 31 U.S.C. § 3730(c)(2)(B). Conditioned upon Relator Hagan's receipt of the payments described in Paragraph 2, all Relators and their heirs, successors, attorneys, agents, and assigns fully and finally release, waive, and forever discharge the United States, its agencies, officers, agents, employees, and servants, from any claims arising from the filing of the Civil Actions or under 31 U.S.C. § 3730, and from any claims to a share of the proceeds of this Agreement and/or the Civil Actions.

8.  Each Defendant has separately provided financial disclosure statements (Financial Statements) to the United States and the United States has relied on the accuracy and completeness of those Financial Statements in reaching this Agreement. Each Defendant warrants that, to the best of their knowledge, their Financial Statements are complete, accurate, and current. If, prior to satisfaction of the full Settlement Amount, the United States learns of asset(s) in which a Defendant had an interest at the time of this Agreement that were not disclosed in the Financial Statements, or if the United States learns of any misrepresentation by any Defendant on, or in connection with, the Financial Statements, and if such nondisclosure or misrepresentation increases the estimated net worth set forth in the Financial Statements by $250,000 or more, the United States may at its option, with respect to the Defendant that made misrepresentations or failed to disclose assets: (a) rescind this Agreement, reinstate this

suit based on the Covered Conduct, and enter the attached Consent Judgment, or (b) let the Agreement stand and collect the portion of the Settlement Amount due from such Defendant plus one hundred percent (100%) of the value of the net worth of such Defendant's previously undisclosed asset(s). Each Defendant agrees not to contest any collection action undertaken by the United States against such Defendant pursuant to this Paragraph, and immediately to pay the United States all reasonable costs incurred in such an action, including attorneys' fees and expenses. In the event that the United States, pursuant to this Paragraph, rescinds this Agreement, each impacted Defendant agrees not to plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any civil or administrative claims that (a) are filed by the United States within 90 calendar days of written notification to such Defendant that this Agreement has been rescinded, and (b) relate to the Covered Conduct, except to the extent these defenses were available on January 12, 2017.

9.      Defendants waive and shall not assert any defenses they may have to any criminal prosecution or administrative action relating to the Covered Conduct that may be based in whole or in part on a contention that, under the Double Jeopardy Clause in the Fifth Amendment of the Constitution, or under the Excessive Fines Clause in the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

10.      Defendants fully and finally release the United States, its agencies, officers, agents, employees, and servants, from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Defendants have asserted, could have asserted, or may assert in the future against the United States, its

agencies, officers, agents, employees, and servants, related to the Covered Conduct and the United States' investigation and prosecution thereof.

11.    Defendants fully and finally release the Relators from any claims (including attorney's fees, costs, and expenses of every kind and however denominated) that Defendants have asserted, could have asserted, or may assert in the future against the Relators, related to the filing of the Civil Actions and the Relators' investigations and prosecutions thereof.

12.    a.    Unallowable Costs Defined: All costs (as defined in the Federal Acquisition Regulation, 48 C.F.R. § 31.205-47) incurred by or on behalf of Defendants, and their present or former officers, directors, employees, shareholders, and agents in connection with:

      i.    the matters covered by this Agreement;

      ii.    the United States' audit(s) and civil investigation(s) of the matters covered by this Agreement;

      iii.    Defendants' investigation, defense, and corrective actions undertaken in response to the United States' audit(s) and civil and any criminal investigation(s) in connection with the matters covered by this Agreement (including attorneys' fees);

      iv.    the negotiation and performance of this Agreement;

      v.    the payment Defendants make to the United States pursuant to this Agreement and any payments that Defendants may make to Relators, including costs and attorneys' fees,

Settlement Agreement:  *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

are unallowable costs for government contracting purposes (hereinafter referred to as Unallowable Costs).

   b.   Future Treatment of Unallowable Costs: Unallowable Costs will be separately determined and accounted for by Defendants, and Defendants shall not charge such Unallowable Costs directly or indirectly to any contract with the United States.

   c.   Treatment of Unallowable Costs Previously Submitted for Payment: Within 90 days of the Effective Date of this Agreement, Defendants shall identify and repay by adjustment to future claims for payment or otherwise any Unallowable Costs included in payments previously sought by Defendants or any of their subsidiaries or affiliates from the United States. Defendants agree that the United States, at a minimum, shall be entitled to recoup from Defendants any overpayment plus applicable interest and penalties as a result of the inclusion of such Unallowable Costs on previously-submitted requests for payment. The United States, including the Department of Justice and/or the affected agencies, reserves its rights to audit, examine, or re-examine Defendants' books and records and to disagree with any calculations submitted by Defendants or any of their subsidiaries or affiliates regarding any Unallowable Costs included in payments previously sought by Defendants, or the effect of any such Unallowable Costs on the amount of such payments.

   13.   a.   The Settlement Amount represents the amount the United States is willing to accept in compromise of its civil claims arising from the Covered Conduct due solely to Defendants' financial conditions as reflected in the Financial Statements referenced in Paragraph 8. In the event that any Defendants fail to pay their respective

portions of the Settlement Amount within fourteen (14) calendar days of the date upon which each such payment is due, such Defendant(s) shall be in Default of their payment obligations (Default). The United States will provide a written Notice of Default, and the Defendant(s) in Default shall have an opportunity to cure such Default within fourteen (14) calendar days from the date of receipt of the Notice of Default. Notice of Default will be delivered to Michael Schaengold, Esq. for NAI and James Tyler and David Burch, Esq. for DCG, or to such other representative as Defendants shall designate in advance in writing. If the Defendant(s) in Default fail to cure the Default within fourteen (14) calendar days of receiving the Notice of Default, and in the absence of an agreement with the United States of a modified payment schedule, the remaining unpaid portion of the Settlement Amount due from the Defendant(s) in Default shall become immediately due from and payable by such Defendant(s), and interest on the remaining unpaid balance shall thereafter accrue at the rate of 12% per annum, compounded daily from the date of Default, on the remaining unpaid total (principal and interest balance) and continuing to and including the day that the Defendant(s) in Default make final payment under the Agreement.

   b.  In the event of Default, Defendant(s) in Default shall agree to a Consent Judgment in the amount of the unpaid balance and in the form attached hereto as Exhibits B.1 (which shall apply to the payments made pursuant to Paragraph 1.a), B.2 (which shall apply to the payments made pursuant to Paragraph 1.b), and B.3 (which shall apply to the payments made pursuant to Paragraph 1.c), and the United States, at its sole discretion, may (i) retain any payments previously made, rescind this Agreement as to the Defendant(s) in Default, and pursue the Civil Actions or bring any civil and/or

administrative claim, action, or proceeding against Defendant(s) in Default for the claims that would otherwise be covered by the releases provided in Paragraphs 4 and 5 above, with any recovery reduced by the amount of any payments previously made by the Defendant(s) in Default to the United States under this Agreement; (ii) take any action to execute and collect on the Consent Judgment from the Defendant(s) in Default; (iii) file an action for specific performance of the Agreement and/or the Consent Judgment against the Defendant(s) in Default; (iv) offset the remaining unpaid balance from any amounts due and owing to Defendant(s) in Default and/or related companies by any department, agency, or agent of the United States at the time of Default; and/or (v) exercise any other right granted by law, or under the terms of this Agreement, or recognizable at common law or in equity, including referral of this matter for private collection against the Defendant(s) in Default. Each Defendant in Default agrees not to contest any offset, recoupment, and/or collection action undertaken by the United States against such Defendant pursuant to this Paragraph, either administratively or in any state or federal court, except on the grounds of actual payment to the United States.

c.     In the event that the United States opts to rescind this Agreement pursuant to this Paragraph, the Defendant(s) in Default agree not to plead, argue, or otherwise raise any defenses of statute of limitations, laches, estoppel or similar theories, to any civil or administrative claims that (i) are filed by the United States against such Defendant(s) within 90 days of providing written notification that this Agreement has been rescinded, and (ii) relate to the Covered Conduct, except to the extent these defenses were available on January 12, 2017.

14.     Each Defendant has reviewed its financial situation and warrants that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(1)(B)(ii)(I) and shall remain solvent following payment to the United States of the Settlement Amount. Further, the Parties warrant that, in evaluating whether to execute this Agreement, they (a) have intended that the mutual promises, covenants, and obligations set forth constitute a contemporaneous exchange for new value given to each Defendant, within the meaning of 11 U.S.C. § 547(c)(1), and (b) conclude that these mutual promises, covenants, and obligations do, in fact, constitute such a contemporaneous exchange. Further, the Parties warrant that the mutual promises, covenants, and obligations set forth herein are intended to and do, in fact, represent a reasonably equivalent exchange of value that is not intended to hinder, delay, or defraud any entity to which any Defendant was or became indebted to on or after the date of any transfer contemplated in this Agreement, within the meaning of 11 U.S.C. § 548(a)(1).

15.     If, within 91 days of the Effective Date of this Agreement or of any payment made under this Agreement, the Defendant making such payment commences, or a third party commences, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking to have any order for relief of such Defendant's debts, or seeking to adjudicate such Defendant as bankrupt or insolvent; or (b) seeking appointment of a receiver, trustee, custodian, or other similar official for such Defendant or for all or any substantial part of such Defendant's assets, then such Defendants agree as follows:

a.     Such Defendant's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. § 547, and such Defendant shall not argue or otherwise

20

take the position in any such case, proceeding, or action that: (i) such Defendant's obligations under this Agreement may be avoided under 11 U.S.C. § 547; (ii) such Defendant was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment made to the United States; or (iii) the mutual promises, covenants, and obligations set forth in this Agreement do not constitute a contemporaneous exchange for new value given to such Defendant.

b.     If such Defendant's obligations under this Agreement are avoided for any reason, including, but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code, the United States, at its sole option, may rescind the releases in this Agreement as to such Defendant and bring any civil and/or administrative claim, action, or proceeding against such Defendant for the claims that would otherwise be covered by the releases provided in Paragraphs 4 and 5, above. Such Defendant agrees that (i) any such claims, actions, or proceedings brought by the United States are not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) as a result of the action, case, or proceedings described in the first clause of this Paragraph, and such Defendant shall not argue or otherwise contend that the United States' claims, actions, or proceedings are subject to an automatic stay; (ii) such Defendant shall not plead, argue, or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel, or similar theories, to any such civil or administrative claims, actions, or proceeding that are brought by the United States within 90 calendar days of written notification to such Defendant that the releases have been rescinded pursuant to this Paragraph, except to the extent such defenses were available on January 12, 2017; and (iii) the United States has an undisputed, noncontingent and liquidated allowed claim in

21

the amount of $25,154,745 against such Defendant, and the United States may pursue its claim in the case, action, or proceeding referenced in the first clause of this Paragraph, as well as in any other case, action, or proceeding.

        c.     Each Defendant acknowledges that its agreements in this Paragraph are provided in exchange for valuable consideration provided in this Agreement.

16.     This Agreement is intended to be for the benefit of the Parties only.

17.     Upon receipt of the payment described in Paragraph 1 and 3, above, the Parties shall promptly sign and file in the Civil Actions a Joint Stipulation of Dismissal of the Civil Actions pursuant to Fed. R. Civ. P. 41(a)(1). The Joint Stipulation of Dismissal shall be (i) with prejudice as to the United States for the Covered Conduct, (ii) with prejudice as to the Relators for their claims for or related to the Covered Conduct or Civil Actions (including attorney's fees, costs, and expenses of every kind and however denominated), and (iii) with prejudice as to the Relators for all claims that the Relators have asserted, could have asserted, or may assert in the future for matters referenced or raised in their Civil Actions on behalf of the United States.

18.     Each Party shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

19.     Each party and signatory to this Agreement represents that it freely and voluntarily enters in to this Agreement without any degree of duress or compulsion.

20.     This Agreement is governed by the laws of the United States. The exclusive jurisdiction and venue for any dispute relating to this Agreement is the United States District Court for the Northern District of New York. For purposes of construing

this Agreement, this Agreement shall be deemed to have been drafted by all Parties to this Agreement and shall not, therefore, be construed against any Party for that reason in any subsequent dispute.

21.     This Agreement constitutes the complete agreement between the Parties. This Agreement may not be amended except by written consent of the Parties.

22.     The undersigned counsel represent and warrant that they are fully authorized to execute this Agreement on behalf of the persons and entities indicated below.

23.     This Agreement may be executed in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement.

24.     This Agreement is binding on Defendants' successors, transferees, heirs, and assigns.

25.     This Agreement is binding on Relators' successors, transferees, heirs, and assigns.

26.     All parties consent to the United States' disclosure of this Agreement, and information about this Agreement, to the public.

27.     This Agreement is effective on the date of signature of the last signatory to the Agreement (Effective Date of this Agreement). Facsimiles of signatures and signatures in portable document format (.pdf) shall constitute acceptable, binding signatures for purposes of this Agreement.

**THE UNITED STATES OF AMERICA**

GRANT C. JAQUITH
United States Attorney

ADAM J. KATZ
CHRISTOPHER R. MORAN
Assistant United States Attorneys

April __30__, 2020


**NORTHLAND ASSOCIATES, INC.
AND JDS CONSTRUCTION, and
JAMES TYLER**

April __30__, 2020

JAMES TYLER

April ___, 2020

_____
MICHAEL J. SCHAENGOLD
MATTHEW J. CANNON
MELISSA PAIGE PRUSOCK
Greenberg Traurig, LLP


**THE DIVERSE CONSTRUCTION
GROUP**

April ___, 2020

_____
DAVID BURCH
GABRIELLE FIGUEROA
Barclay Damon, LLP

24

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

**THE UNITED STATES OF AMERICA**

GRANT C. JAQUITH
United States Attorney

April ___, 2020        _____

ADAM J. KATZ
CHRISTOPHER R. MORAN
Assistant United States Attorneys

**NORTHLAND ASSOCIATES, INC.
AND JDS CONSTRUCTION, and
JAMES TYLER**

April ___, 2020        _____

JAMES TYLER

April _30_, 2020        _____

MICHAEL J. SCHAENGOLD
MATTHEW J. CANNON
MELISSA PAIGE PRUSOCK
Greenberg Traurig, LLP

**THE DIVERSE CONSTRUCTION
GROUP**

April ___, 2020        _____

DAVID BURCH
GABRIELLE FIGUEROA
Barclay Damon, LLP

24

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

THE UNITED STATES OF AMERICA

GRANT C. JAQUITH
United States Attorney

April ___, 2020

_____

ADAM J. KATZ
CHRISTOPHER R. MORAN
Assistant United States Attorneys

**NORTHLAND ASSOCIATES, INC.
AND JDS CONSTRUCTION, and
JAMES TYLER**

April ___, 2020

_____

JAMES TYLER

April ___, 2020

_____

MICHAEL J. SCHAENGOLD
MATTHEW J. CANNON
MELISSA PAIGE PRUSOCK
Greenberg Traurig, LLP

**THE DIVERSE CONSTRUCTION
GROUP**

April _30_, 2020

_____

DAVID BURCH
GABRIELLE FIGUEROA
Barclay Damon, LLP

**RELATOR JAMES HAGAN**

April 30, 2020

_____
JAMES HAGAN

April 30, 2020

_____
ROBERT W. SADOWSKI
Robert W. Sadowski PLLC

**RELATOR JAMES HOHM**

April ___, 2020

_____
JAMES HOHM

April ___, 2020

_____
CLARK J. BOLTON
Bolton Law, PLLC

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

**RELATOR JAMES HAGAN**

April ___, 2020

_____
JAMES HAGAN

April ___, 2020

_____
ROBERT W. SADOWSKI
Robert W. Sadowski PLLC

**RELATOR JAMES HOHM**

April 30 2020

_____
JAMES HOHM

April 30, 2020

_____
CLARK J. BOLTON
Bolton Law, PLLC

25

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

# Exhibit A

**DRAFT FOR REVIEW ONLY**
**THIS IS NOT INTENDED TO BE A LIVE TRANSACTION**

M & T Bank
Trade Finance Operations
1800 Washington Boulevard 8th Floor, MC-MD1-MP37 Baltimore, MD 21230
Tel: Letters of Credit: (410) 244-4475 / 4587
Tel: Collections: (410) 244-4566
SWIFT: MANTUS33INT

Beneficiary:                                                        Applicant:

Date of Issue:                                                     Date and Place of Expiry:

SLC Amount:  $0.00

WE HEREBY ESTABLISH OUR IRREVOCABLE STANDBY LETTER OF CREDIT IN YOUR FAVOR FOR THE ACCOUNT OF (APPLICANT) FOR AN AMOUNT NOT TO EXCEED IN AGGREGATE (AMOUNT OF LETTER OF CREDIT) AVAILABLE BY YOUR SIGHT DRAFT(S) DRAWN ON M AND T BANK BEARING THE CLAUSE, "DRAWN UNDER M AND T BANK IRREVOCABLE STANDBY LETTER OF CREDIT NO. (NUMBER OF CREDIT) DATED (DATE OF ISSUE)," ACCOMPANIED BY THE FOLLOWING DOCUMENTS:

1.  THE ORIGINAL LETTER OF CREDIT WITH ANY AMENDMENTS THEREOF.

2.  BENEFICIARY SIGNED STATEMENT STATING: (EXAMPLE: "(APPLICANT) HAS FAILED TO PERFORM UNDER THE TERMS AND CONDITIONS OF THE AGREEMENT BETWEEN (BENEFICIARY) AND (APPLICANT)."

IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED WITHOUT AMENDMENT FOR ONE YEAR FROM THE PRESENT OR ANY FUTURE EXPIRATION DATE OF THIS LETTER OF CREDIT UNLESS AT LEAST THIRTY (30) DAYS PRIOR TO SUCH EXPIRATION DATE WE NOTIFY YOU BY REGISTERED LETTER OR OVERNIGHT COURIER, THAT WE ELECT NOT TO CONSIDER THIS LETTER OF CREDIT RENEWED FOR SUCH ADDITIONAL PERIOD.

WE HEREBY ENGAGE WITH YOU THAT DRAFTS DRAWN AND PRESENTED IN COMPLIANCE WITH THE TERMS OF THIS LETTER OF CREDIT WILL BE DULY HONORED BY US IF PRESENTED AT OUR OFFICE AT THE ABOVE ADDRESS ON OR BEFORE THE EXPIRATION DATE, NO LATER THAN 5:00 PM.

THIS LETTER OF CREDIT SETS FORTH IN FULL THE TERMS OF OUR UNDERTAKING AND SUCH UNDERTAKING SHALL NOT IN ANY WAY BE MODIFIED, AMENDED, OR AMPLIFIED BY REFERENCE TO ANY DOCUMENT(S), INSTRUMENT(S), CONTRACT(S) OR AGREEMENT(S) REFERRED TO HEREIN OR IN WHICH THIS LETTER OF CREDIT IS REFERRED TO OR IN WHICH THIS LETTER OF CREDIT RELATES, AND ANY SUCH REFERENCE SHALL NOT BE DEEMED TO INCORPORATE HEREIN BY REFERENCE ANY DOCUMENT(S), INSTRUMENT(S), CONTRACT(S), OR AGREEMENT(S).

THIS LETTER OF CREDIT IS SUBJECT TO THE INTERNATIONAL STANDBY PRACTICES 1998 (ISP 98), ICC PUBLICATION NO. 590.

M & T BANK

_____
OFFICER

**DRAFT FOR REVIEW ONLY**

**THIS IS NOT INTENDED TO BE A LIVE TRANSACTION**

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

# Exhibit B.1

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES HAGAN, | |
| Plaintiff/Relator, | |
| v. | Case No. 5:17-cv-036 (GTS/TWD) |
| NORTHLAND ASSOCIATES, INC., THE DIVERSE CONSTRUCTION GROUP, LLC and JAMES TYLER, | |
| Defendants. | |

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES HOHM, | |
| Plaintiff/Relator, | |
| v. | Case No. 5:18-cv-516 (GTS/TWD) |
| NORTHLAND ASSOCIATES, INC., NORTHLAND/JDS CONSTRUCTION, JAMES M. TYLER, and THE DIVERSE CONSTRUCTION GROUP, LLC, | |
| Defendants. | |

## CONSENT JUDGMENT

This matter is before the Court upon the consent of the United States of America (United States), Defendants Northland Associates, Inc., Northland/JDS Construction, and James Tyler (collectively, "NAI Defendants"), and Relators James Hagan and James Hohm (collectively, "Relators"). The United States, NAI Defendants, and Relators are collectively referred to herein as "the Parties."

29

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

The NAI Defendants consent to entry of this judgment against them in Case Nos. 5:17-cv-036 and 5:18-cv-516 (collectively, the "Civil Actions"), both pending before this Court. As established by the attached Settlement Agreement, the Court finds as follows:

1.      This Court has jurisdiction over the Parties as well as over the subject matter of the Civil Actions.

2.      The Parties negotiated an agreement that resolved all claims that the Relators filed on behalf of the United States in the Civil Actions (the "Agreement").

3.      The Settlement Agreement required the NAI Defendants to make an initial payment to the United States no later than December 20, 2020. The NAI Defendants are in Default, as defined in paragraph 13 of the Agreement, because those Defendants have failed to timely meet their payment obligations. Notice of Default has been given to the NAI Defendants and the 14-day period to cure the Default provided in the Agreement has expired.

4.      In the Agreement, the NAI Defendants agreed that if they were in Default as to their payment obligations under Paragraph 1.a of the Agreement, and did not timely cure that Default, this consent judgment would be entered in favor of the United States against them for the amount set forth below. Such a Default has occurred.

**WHEREFORE, IT IS HEREBY ORDERED** that judgment be entered in favor of the United States and against the NAI Defendants in the amount of $2,125,000, plus interest accrued thereon and less any amount previously paid by the NAI Defendants to the United States pursuant to the Agreement. As set forth in the Agreement, interest shall accrue as follows: (a) at a rate of 2.125% per annum, from April 24, 2020 until and including the day prior to Default, and (b) at a rate of 12% per annum, compounded

30

daily, from the date of Default and continuing to and including the day that the NAI

Defendants make final payment under the Agreement.

**IT IS SO ORDERED.**


Dated:_____          _____
                                        Hon. Glenn T. Suddaby
                                        Chief U.S. District Judge

# Exhibit B.2

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES HAGAN, <br><br> Plaintiff/Relator, <br><br> v. <br><br> NORTHLAND ASSOCIATES, INC., THE DIVERSE CONSTRUCTION GROUP, LLC and JAMES TYLER, <br><br> Defendants. | Case No. 5:17-cv-036 (GTS/TWD) |
| UNITED STATES OF AMERICA *ex rel.* JAMES HOHM, <br><br> Plaintiff/Relator, <br><br> v. <br><br> NORTHLAND ASSOCIATES, INC., NORTHLAND/JDS CONSTRUCTION, JAMES M. TYLER, and THE DIVERSE CONSTRUCTION GROUP, LLC, <br><br> Defendants. | Case No. 5:18-cv-516 (GTS/TWD) |

## CONSENT JUDGMENT

This matter is before the Court upon the consent of the United States of America (United States), Defendant the Diverse Construction Group, LLC ("Defendant DCG"), and Relators James Hagan and James Hohm (collectively, "Relators"). The United States, Defendant DCG, and Relators are collectively referred to herein as "the Parties."

Defendant DCG consents to entry of this judgment against it in Case Nos. 5:17-cv-036 and 5:18-cv-516 (collectively, the "Civil Actions"), both pending before this Court. As established by the attached Settlement Agreement, the Court finds as follows:

1.      This Court has jurisdiction over the Parties as well as over the subject matter of the Civil Actions.

2.      The Parties negotiated an agreement that resolved all claims that the Relators filed on behalf of the United States in the Civil Actions (the "Agreement").

3.      The Settlement Agreement required Defendant DCG to make an initial payment to the United States no later than December 20, 2020. Defendant DCG is in Default, as defined in paragraph 13 of the Agreement, because that Defendant has failed to timely meet its payment obligations. Notice of Default has been given to the Defendant DCG and the 14-day period to cure the Default provided in the Agreement has expired.

4.      In the Agreement, the Defendant DCG agreed that if it was in Default as to its payment obligations under Paragraph 1.b of the Agreement, and did not timely cure that Default, this consent judgment would be entered in favor of the United States against it for the amount set forth below. Such a Default has occurred.

**WHEREFORE, IT IS HEREBY ORDERED** that judgment be entered in favor of the United States and against Defendant DCG in the amount of $100,000, plus interest accrued thereon and less any amount previously paid by the Defendant DCG to the United States pursuant to the Agreement. As set forth in the Agreement, interest shall accrue as follows: (a) at a rate of 2.125% per annum, from April 24, 2020 until and including the day prior to Default, and (b) at a rate of 12% per annum, compounded

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

daily, from the date of Default and continuing to and including the day that Defendant DCG makes final payment under the Agreement.

**IT IS SO ORDERED.**


Dated:_____

_____
Hon. Glenn T. Suddaby
Chief U.S. District Judge

# Exhibit B.3

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* JAMES HAGAN, <br><br> Plaintiff/Relator, <br><br> v. <br><br> NORTHLAND ASSOCIATES, INC., THE DIVERSE CONSTRUCTION GROUP, LLC and JAMES TYLER, <br><br> Defendants. | Case No. 5:17-cv-036 (GTS/TWD) |
| UNITED STATES OF AMERICA *ex rel.* JAMES HOHM, <br><br> Plaintiff/Relator, <br><br> v. <br><br> NORTHLAND ASSOCIATES, INC., NORTHLAND/JDS CONSTRUCTION, JAMES M. TYLER, and THE DIVERSE CONSTRUCTION GROUP, LLC, <br><br> Defendants. | Case No. 5:18-cv-516 (GTS/TWD) |

## CONSENT JUDGMENT

This matter is before the Court upon the consent of the United States of America (United States), Defendant Northland Associates, Inc. ("Defendant NAI"), and Relators James Hagan and James Hohm (collectively, "Relators"). The United States, Defendant NAI, and Relators are collectively referred to herein as "the Parties."

Settlement Agreement: *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

Defendant NAI consents to entry of this judgment against it in Case Nos. 5:17-cv-036 and 5:18-cv-516 (collectively, the "Civil Actions"), both pending before this Court. As established by the attached Settlement Agreement, the Court finds as follows:

1.      This Court has jurisdiction over the Parties as well as over the subject matter of the Civil Actions.

2.      The Parties negotiated an agreement that resolved all claims that the Relators filed on behalf of the United States in the Civil Actions (the "Agreement").

3.      The Settlement Agreement required Defendant NAI to pay the United States the remaining balance of the Settlement Amount due following the December 20, 2020 payments (excluding the amount due from DCG pursuant to Paragraph 1.b of the Agreement), plus simple interest at the rate identified in Paragraph 1 of the Agreement, in five equal installments, on the following dates: (i) October 20, 2021; (ii) October 20, 2022; (iii) October 20, 2023; (iv) Oct 20, 2024; and (v) April 30, 2025. Defendant NAI is in Default, as defined in paragraph 13 of the Agreement, because that Defendant has failed to timely meet its payment obligations. Notice of Default has been given to Defendant NAI and the 14-day period to cure the Default provided in the Agreement has expired.

4.      In the Agreement, Defendant NAI agreed that if it was in Default as to its payment obligations under Paragraph 1.c of the Agreement, and did not timely cure that Default, this consent judgment would be entered in favor of the United States against it for the amount set forth below. Such a Default has occurred.

**WHEREFORE, IT IS HEREBY ORDERED** that judgment be entered in favor of the United States and against Defendant NAI in the amount of the remaining balance

Settlement Agreement:  *United States ex rel. James Hagan v. Northland Associates, Inc., et al.*, Case No. 5:17-cv-036 (N.D.N.Y.) and *United States ex rel. James Hohm v. Northland Associates, Inc., et al.*, Case No. 5:18-cv-516 (N.D.N.Y.)

of the Settlement Amount due following the December 20, 2020 payments (excluding the payments due from DCG, pursuant to Paragraph 1.b of the Agreement), plus interest accrued thereon and less any amount previously paid by Defendant NAI to the United States pursuant to the Agreement. As set forth in the Agreement, interest shall accrue as follows: (a) at a rate of 2.125% per annum, from April 24, 2020 until and including the day prior to Default, and (b) at a rate of 12% per annum, compounded daily, from the date of Default and continuing to and including the day that Defendant NAI makes final payment under the Agreement.

**IT IS SO ORDERED.**

Dated:_____          _____

Hon. Glenn T. Suddaby
Chief U.S. District Judge